Anyway, this is my first opportunity to sit in this environment, and I think likewise for at least one of my colleagues, and we're very glad that you've agreed to appear in person. We will endeavor to make this as much like normal oral argument as we can, and with that we have our usual array of rules, which are that we have read the briefs and record excerpts. We have not necessarily read the entire record, so we appreciate record citations when you have those. Also we have the time clocks, which are obvious, and I think you're aware that when the red light comes on at least we ask you to conclude your argument unless you're answering a question from the bench. Have I forgotten? I don't think I've forgotten anything. We know you all. With that, we'll call the first case of the afternoon, Number 19-50997, United States v. Gaspar-Felipe. We'll hear first from Ms. Miller. May it please the Court. By the way, give me your credit card, please. I'm not sure if Your Honor wants that. May it please the Court. My name is Stephanie Miller. I represent Mr. Gaspar-Felipe with my co-counsel Damien Castillo. We were co-counsel at the trial of this case. At trial, and let me go back here, Mr. Castillo will be focusing on the Confrontation Clause issue dealing with the unavailability of the two material witnesses. Unless otherwise directed by the Court, I will be focusing on the 10-level enhancement imposed at sentencing as a result of the death conduct. At trial, the jury made a finding that Mr. Gaspar-Felipe's conduct did not result in the death. At sentencing, he received a 10-level upward adjustment based on the death and guideline 2L1.1B7D. This increase represents an increase from 27 months to 78 months, which is a difference of 51 months as opposed to what it would have been at 27 months without being attributed for the death, which is what he would have received otherwise. I think three things make this case unique. First, the jury finding acquitting him of the conduct resulting in the death. Second, Mr. Gaspar-Felipe's complete removal, in a couple of different senses, from the scene of the shooting and the death. First, physically, he was over 50 miles away and over an hour by driving time away from the shooting scene. He was in a completely different vehicle. Second, from any decision-making process, he was completely removed from the drivers of the vehicle, from commanding or telling the drivers what to do, and the entire evading of law enforcement aspect of the case. He had no input on that aspect of the case whatsoever. Third, the manner of the death itself, by an intentional shooting by law enforcement, which fired over 40 times at a vehicle that had already been disabled by a controlled tire deflation device. It was already slowing down and pulling off to the side of the road at the time that law enforcement, in contravention of its own internal policy, fired at the vehicle and in the line of sight of an inhabited residence. I believe that these things need to be established in order to have a discussion about relevant conduct in terms of Mr. Gaspar-Felipe and in terms of his co-defendants. First, Watts, of course, describes when we should consider acquitted conduct, and it describes two things. First, that it becomes established as relevant conduct, and second, that it's established by a preponderance of the evidence. Ms. Miller, did the court say he would have imposed the same sentence anyway? I don't believe the court said that it would impose the same sentence. Does Your Honor mean if it hadn't attributed the death? Correct. No, I do not believe that that was stated during the sentencing hearing, Your Honor. So when talking about relevant conduct, Mr. Gaspar-Felipe's conduct in this case had to do with guiding this group of individuals to a pickup location. That's where his relevant conduct for him stopped. The people were picked up by these two vehicles. Mr. Gaspar-Felipe was in a passenger position, and testimony showed that he never said another word past that point in the case until days and days after the events of the shooting took place. If we look at jointly undertaken activity, then we start looking at the scope of Mr. Gaspar-Felipe's activity. His agreement is to help transport these people to the pickup location. This is not like a burglary case in which there is some inherent violence possibly involved in the case itself. This is an alien smuggling case, and I believe statistics . . . I would disagree with that proposition. Would you like me to go on? Well, no, you may go on, but I would disagree with the proposition that alien smuggling is not inherently violent. I mean, for instance, at least apparently two-thirds of all females get sexually abused during the process. When we look at some of the statistics involved, and here's where I was drawing my information from, Border Patrol Customs, they have statistics that they put forth. From 2013 until 2017, and there are hundreds of alien smuggling cases in the western district of Texas, that's a lot of the cases that happen out there, less than 1% of the cases resulted in a death. The types of deaths and the types of harm that typically take place from the case law that I was able to find involved deaths from exposure, from dehydration, or from being packed too tightly or in unsafe conditions in a vehicle. None of those things occurred in this case. The type of harm that took place here had to do with a shooting after an evasion by law enforcement, which had nothing at all to do with what Mr. Gaspar Felipe contributed to this offense. Well, it's not, I mean, that was what happened in Ruiz Hernandez also, right? I'm sorry? Wasn't it Ruiz Hernandez where the lady, it appears that the lady's little pink buoy got, or floating device got run over by a vehicle, by a boat? By the Coast Guard vessel, yes, Your Honor. I think Ruiz Hernandez can be distinguished from the facts of this case because of the attenuation in this case. So in Ruiz Hernandez, the defendant involved had a hand in instructing, causing that person to swim in the inner tube and be struck accidentally by the Coast Guard vessel. So in this case, Mr. Gaspar Felipe's conduct is far more attenuated than any case law we've been able to find. Ruiz Hernandez wasn't a relevant conduct issue because the defendant herself was right there at the scene where the boat hit the raft, basically. No, that's correct, Your Honor. I think Ruiz Hernandez spoke more to a but-for causation standard, and our argument would be that a but-for causation standard is the holding of the court. We think that the specific facts in this case are so far attenuated past anything that's been considered under a but-for causation standard in the past, that at some point, that standard needs to find a limit. So we offer to the court that this particular case, with these specific case facts, are attenuated enough to establish some sort of limit there. Let me ask you a question. Suppose somebody involved in the smuggling of the defendant has COVID and one of the smugglees gets COVID. Is that attenuated? I think that that particular case, Your Honor, sort of falls under the Ramos Delgado example of a defendant who was driving a truck, and then a passenger fell off the back of the truck, sprained his wrist, wound up in the hospital, and the gas leak blew the hospital up. In that case, and in Your Honor's example, both of the defendants are involved in actually driving in proximity. They're much closer to what happens. In our defendant's case, he is so far removed from the decision-making that occurred and the type of harm that occurred here, an intentional shooting by law enforcement being completely different. What contact phone numbers were on his phone? I'm sorry, Your Honor, I couldn't hear. Were there contact numbers on his phone? I don't remember that, Your Honor. We need to look. Yes, Your Honor. May I finish my point I have? I just wanted to say, even if there was contact information on his phone, he didn't say a word or command or instruct anybody once he was in the vehicle, so his conduct stopped then. All right. Thank you. Thank you. You have time for rebuttal. All right. Mr. Castillo. May it please the Court. My name is Damien Castillo, and I am also co-counsel for the appellant, Mr. Gaspar Felipe. The constitutional issue I'd like to address is dealing with the introduction of the videotape deposition and transcripts at trial of the two material witnesses. There's no dispute that those statements served as testimonial statements. The only issue is whether the two aliens were unavailable for the purposes of the Confrontation Clause. Now, under the Confrontation Clause in this setting, a witness is unavailable if the prosecutorial authorities have exercised good faith, reasonable efforts in attaining the witness's presence at trial. The first part of those efforts deals with, in the context of alien witnesses, whether the government made efforts of keeping the witnesses in the United States, even though it's not required to. Now, in the case of U.S. v. Alley, which is cited in both briefs, the Court there did find good faith efforts were exhausted, partly because the government gave the option to the witnesses of remaining in the United States, but gave them the option of doing it. They could return to Mexico. They could stay in the U.S. That's a key distinction from this case here, where the aliens weren't given that option. They were just told, you're going to be deported back to your home country of Guatemala, and here are some instructions if your presence is required at trial. Do we know for a fact that they reached Guatemala? We do not, Your Honor. We do not. And that goes to the next point. If the witnesses are deported, as they do in many cases, the government has to take steps to make sure that those witnesses' return for trial is successful. So, for instance, in U.S. v. Foster, the Court established that determining whether the contact information has been verified is an important step. And in that court, the Court stated, and I quote, Verifying the contact information provided by a material witness in an alien smuggling case before deporting the witness to his home country is a crucial step that, if not undertaken, will almost certainly handicap the government's efforts to maintain contact. Well, in this case, the testimony showed that the witnesses provided the government a phone number, they provided an address. However, no actions were taken by the government to verify the authenticity or workability of that phone number. Of course, the government argues that they made nine phone call attempts on nine different occasions to each witness, and the efforts became futile. Well, that's going to happen if you never verified that contact number to begin with, nor the address. The case cited of U.S. v. Alley and U.S. v. Foster both also made other attempts to communicate with alien witnesses, such as mailing letters to the witnesses to the addresses provided. Again, in the facts of this case, the aliens provided an address, but there's nothing in the record to show that the government even attempted to mail correspondence to those addresses. Was there mailing in Foster? I believe in U.S. v. Foster, Your Honor, the court did note that, if I may just have a minute, there were letters sent to the addresses, Your Honor, in U.S. v. Foster. So it was mail and calls in Foster?  In addition— Well, you say the phone numbers weren't verified, but it says here that Officer Avalos spoke with one Sebastian's father. That's correct, Your Honor, and when I talk about verifying the authenticity, I believe what the court is referring to is prior to the aliens being deported. Now— Why? I mean, if the phone reaches his dad, guess whose phone it is. I understand, Your Honor, and, of course, that's what the individual who answered the phone said, that he's his father. However, nothing fruitful came of that contention. The person on the other line did say he was the father, but nothing was done to establish communication. There's no evidence that says that he told them, I'm going to have my son contact you shortly, or I'm going to get you in contact with him in some other form. That wasn't done. I'll also note this. In U.S. v. Foster, there were several attempts. They made four, six attempts at contacting the witnesses by phone, but there were also— and I missed this, Your Honor, earlier when you asked me the question of contact— there were also four attempts to communicate with the witnesses by email. So if you put those together, that's a total of ten contacts attempted by the government in that case. I'm not trying to say there's a bright-line rule. I don't think the courts have established, if you call witnesses this many times, you've met that good-faith effort. That just goes to show that despite the nine attempts in this case, I don't think that's sufficient to show those efforts. In addition, if I may bring another issue into play, it's the veracity and the unsworn representations made by the government at the motion hearing. The court— But here there was testimony, unlike in Foster. There was testimony, right? Yes, Your Honor. In this case, there was no testimony. In this case, the government filed a motion, and attached to the motion, I believe they put a short memo from a case agent. There were no sworn affidavits put into evidence showing the calls were made. There was no witness testimony. And again, I'm discussing the pretrial motion where this issue came up. There were no exhibits admitted into evidence. There was one memo put in the back of the government's motion at the pretrial hearing, and the memo was from the agent telling the court through this memo that he had these nine contacts with each witness. And then if you read further on in that memo attached, he talks about how he was going to do flight arrangements if necessary for the witnesses. The problem there, Your Honor, goes back to the subpoena and the letter that was given to these alien witnesses at the time of their deposition. They were given a subpoena in English only, which this—we're dealing with Spanish-speaking witnesses, but they were also given a letter. The letter wasn't Spanish. However, if the court looks at the letter, and it's part of the record, the letter was giving instructions on how to get to the port of entry from Mexico to the United States. You said there was—I'm reading this testimony of Joel Avalos. You called him about nine different days, beginning December 15th and ending on May 29th. Is that correct? Correct. You talked to his father on a couple occasions. Is that correct? Yes. Did you ever talk to him directly? No. Did you ever send him any emails? No. Did you ever mail him any letters? No. So wasn't there testimony about all this? I believe that was testimony at trial. Yes, Your Honor. At the trial—maybe I should make that distinction. At the trial, there was testimony, but the court had already made its decision in a pre-trial hearing. On the first volume, the court had made its determination. So you don't think we can consider the trial testimony? I don't know if we can or not. Well, I believe you can, Your Honor, but again, we're just going based on what the court, the district court had in front of it itself at the time of the motion hearing and the record establishes that in the first volume. If I could just finish my final thought on this case. Again, it's not certainly one factor that shows good faith. I believe the courts have established just an aggregation of factors, and I believe based on all the factors in this case, including the acts before deportation, but especially those that are lacking after, show that that good faith effort and reasonable measures were not taken in this case. Thank you, Your Honor. All right. Thank you. Mr. Durbin. Good afternoon. Good afternoon. May it please the Court. Is that a COVID beard, Mr. Durbin? Sorry? Is that a COVID beard? No, no. I haven't seen you for a while. Well, it's a little bit whiter than it was probably the last time you saw it. It's a COVID white, is what I think it is. Let me start with the confrontation issue, and I would suggest to the court that the Foster case, which also came out of our district, was sort of the low end of a spectrum that the court has talked about in terms of what amounts to a reasonable effort in order to obtain the appearance of material witnesses in a case like this. I looked at the cases and have sort of come up with . . . I identify basically . . . I'm sure they can be divided in different ways, but there are basically 19 things that the cases look at that the government can do. One is to advise the witness of the option to stay in the United States. That wasn't done, and it wasn't agency practice. Whether or not that's an excuse, I don't know, but that was not done. Advise the witness the testimony would be needed at trial. They were. They were advised during the material witness deposition. They're under oath. Secure the witness's agreement to return for trial. Both material witnesses said that they would. They understood, and they said that they would. Issue and serve with a subpoena, and that was attached to the government's motion, and each was served with a subpoena. They were in English, but they each received a subpoena. They also each received a letter that was in English and in Spanish, signed by the assistant U.S. attorney, advising them that expenses would be reimbursed or expenses would be paid. They'll take care of travel expenses. They'll take care of lodging. One of the things the court has looked at is the advancement of travel plans. They were not advanced here because this occurred probably eight months or more, about eight months before the trial. Explain instructions for returning to the United States. That was done generally with more to follow when they were contacted, if they were needed. They exchanged contact information. The witnesses were given the agent's contact information, and they were told when you get to the port of entry, tell the people at the port of entry to contact special agent Jose Alvarez. Verify contact information. I think Judge Costa, as you pointed out, it was verified with respect to the material witness Juan Sebastiano because he got a hold of his father. Indeed, his father gave him another number that the agent used on several occasions to attempt to reach Sebastiano. Counsel, can you hear me? Yes, pretty much. Mr. Castillo suggested that the government ought to verify the contact information before deportation. I think that's what he said. Can you comment on whether that's feasible, whether the government does something to verify already when it gets the contact information? Can you illuminate that issue at all? It's not in the record, Your Honor. I don't know how that would necessarily be done, especially in a country like Guatemala or in the northern triangle countries. This is not a case involving material witnesses from Mexico where we have much better contact across the border. I don't know exactly how that would be done. My understanding of the record is that the material witnesses did not have email addresses and that it was our understanding that the addresses that they had were their residencies, but they weren't necessarily mailing addresses. I don't know the basis for that, but that is as I understand the testimony that's in the record. It seems to me that when the agent calls six weeks after the deposition and reaches to defend a person who identifies himself, the first time it was a woman who answered and said that he's not here, called back later. The second time he called, he spoke to a man who identified himself as a father and spoke to him several times in subsequent calls, got a follow-up telephone number. In a number of those calls where he tried to reach at the contact number, he also tried at the second number. So there were efforts made to reach out to him. There was no email to do and there were not letters done. But in contrast, there are several major contrasts to Foster. In Foster, we waited too long to try to reach out to the aliens, and I think that's part of what bothered the panel. We waited three and a half months before we even made efforts. In this instance, we started our efforts and made contact at least with people connected to at least one of the aliens six weeks after the depositions, and that was a good seven months prior to the trial, and those contacts went on for a period of five or six months with those efforts. On this list also, one thing we did not do, and I don't know if it would have made a difference, which we did not in this instance attempt to contact the witnesses' attorneys. We didn't do that in that case. I don't know why it's not in the record. I don't know if it would have made a difference. We did not make an effort to contact the foreign government. I don't know the reasons for that. With Mexico, it's a little bit easier because we have those connections. When we get into Central America, there are some fraught circumstances there that may make it something we don't want to do. If it's somebody who's trying to flee the country for some reason, we do not want to give word to the government that we're trying to get this person back to the United States. The other big distinction is in Foster, the information was based solely on what the court characterized as unsupported representations by the prosecutor in the written motion. In this particular case, as you pointed out, Judge Costa, there was testimony by Special Agent Avalos during the trial about the efforts that he made. It wasn't simply the representation in the motion, but the motion also had with it a specific memorandum written by the agent to the assistant U.S. attorney for purposes of the motion that detailed the telephone calls that he had made trying to reach, what he did and what kind of contact he had. There was copies of the subpoenas. There were copies of the letters, both in Spanish and English, that were part of the record. There was deposition testimony. There was an agent memo. Then there was agent trial testimony. I think the question . . . I read Foster, though, as saying there were these problems perhaps with the evidence, but we're going to assume it's all admissible and it's still not enough. The timing was different. That favors you versus Foster. But they did try different means in Foster, like mail and email. How does that wash out against the difference in time? Well, I think that the issue before the court is, did we make reasonable efforts to get them back? Not did we check every single one of these, but if you look at it on the continuum, did we maintain contact? Were we diligent about trying to make contact sufficiently early on so we didn't lose track of them or lose sight of them? I'm not entirely sure that those additional steps would have made a difference beyond what we had already done in the telephonic contact and securing their agreements to come back and so forth and giving them documentation. Foster, if that is the low end of contact, it is also an unpublished opinion. So why are we spending so much time on Foster as opposed to the other cases in these theories? Well, because I think it's instructive in looking at it in the continuum. I mean, Foster talks about other cases. It talks about Alley. It talks about Guadian-Salazar, where there was a concession by the government. It talks about Tirado-Tirado, and if you go through those, we didn't do much anything in Tirado-Tirado. And then the other one that they talk about is Calderón-López, where the government didn't do as much in Calderón-López, I think, as we did in this case. But the panel in Calderón-López, which was also unpublished, they found those efforts were reasonable. And so I think those cases are instructive for illustrating what the spectrum is, and I think on this spectrum, the facts of this case fall a whole lot closer to. They don't mirror, but they're a whole lot closer to Alley, because in Alley, we actually kept the witnesses. Back in the 90s or whatever it was, the agency would let us keep the witnesses. But we're a whole lot closer to that, I think, than we are at the other end of the spectrum, where you've got Foster and Tirado-Tirado in those cases. Are there any more questions on that? I'll move to the death, if you'd like. Why don't you move on to the enhancement? I will move on to the enhancement. As I understand the court's analysis, and I think that Ruiz-Hernández and Ramos-Delgado are the two most instructive cases. But the first question is, was the defendant involved in jointly undertaken activity that resulted in, that was a but-for cause of the death? And I think the jointly undertaken activity in this case, and the evidence shows that he served as a guide for nine days in the desert between Okinawa and Alpine. Then he was traveling with a group of aliens. They were in two vehicles. One got stopped, and that's the one that he was in, but he fled, and he and the aliens, inferentially from the evidence, were on their way to Hobbs, New Mexico, where these three or four kids were from, who were doing the transporting. And he was going to Hobbs, New Mexico, I think for two reasons. One is, was to make sure that the subsequent payments that the aliens had to make for their transport were made. Because according to the documentary evidence and the testimony, as I read it, there are text messages that go back and forth that talk about or that relate to aliens and Western Union money grabbers. And those occur the day before the aliens are released from Hobbs, from Hobbs or Seminole, whichever one it is, or 30 miles apart or something like that. But the aliens were being held until the payments were confirmed, and then they were released, and then the day after that, Carlos Gomez is arrested, and very shortly after that, Mr. Gaspar is arrested. And his arrangement then was to return or be returned to Okinawa down on the border. And our inference is, he was going back, he was going to do this again. He was caught down in Brewster County, having entered in Presidio County in about February of 2018. So he had been in before, and the inference was, this is what his job was. He was the guide across the desert, then he would see them to the holding location until the payments were made, and then when the payments were confirmed, they would be released. And I think that's in the record. I don't know that that's exactly how we argued it. I don't think it's too difficult to show there was jointly undertaken activity. To me, the harder question on this enhancement is foreseeability. What's your best case that . . . I mean, you basically have here, the death happens, what, ninety miles from where the defendant is, after the other car has run over two sets of spikes, I think avoided a third, drives into oncoming traffic in an area with schools that causes law enforcement to shoot at the car. I mean, what's in the range of similar conduct that's been held to be foreseeable in this area? Well, I think the language in Ruiz-Hernandez is probably the strongest language here because it talks about . . . it's not the . . . the foreseeability turns on whether harm of a general sort to persons of a general class might have been reasonably anticipated by a reasonably thoughtful person, but it's not that the manner of death is necessarily foreseeable. So that there would be a high risk of serious injury or death during this part of the transportation of aliens I think is reasonably foreseeable. That's what Ramos Delgado was about. That was an accident. That was a wreck. The defendant died, by the way, if I understand it correctly, of acute myocardial infarction. But it was occasioned by the wreck. It was occasioned by his efforts to evade law enforcement. What are we reviewing? What's the standard of review on this question? I think the standard of review is the clear error standard for the district court's finding. On foreseeability? The district court's finding under foreseeable . . . well, under jointly undertaken conduct and under foreseeability. The first is it has to be jointly undertaken, and I think it was. He wasn't finished. His job didn't end in Alpine when they all got in the cars. And I have a little bit of problem conceptually with the distance, distinction of the distance factor, because what if he had been in the car? He could have just as easily have been in the Chrysler that was shot up. Then would it have been now . . . There would be no question in that case. We wouldn't be asking the question. And they were driving in tandem. But it wouldn't be relevant conduct in that case. I'm sorry? You wouldn't have to resort to relevant conduct if he's in the car, like in Ruiz-Hernandez. I don't know that I have to . . . I mean, I think it already was relevant conduct. It was just a circumstance that the pickup truck struck the spike strip, and it was stopped, and then it was 50 miles away, but they covered that 50 miles in probably about half an hour. They were traveling 100 miles an hour, and there was nothing on those roads. I mean, that's a straight shot, basically, from Alpine up to Monahans. And so I'd submit to the court that that's sort of a red herring. I mean, I know that's the circumstance, but I don't think that makes any difference. But there's only foreseeability if you're in a, as you say, jointly undertaken inquiry. If you're just the one driving that car, it just didn't result in death, there's no foreseeability requirement at all. Of the manner of the death. I mean, that it's going to be caused, and it's a but-for causation because of the reckless, dangerous activity. It's very foreseeable they're going to try to evade capture. I mean, there are all kinds of things. I mean, we had some case, the guy drove through a fence and into a pond, into a cattle tank, and people inside the car drowned in Petula, Texas, which nobody would expect. I mean, the manner of death is surprising. I was about to bring up drowning as an unforeseeable cause of death here, but now you just told me that that could be foreseeable. Is that a published case from our side? It's not a published case, but I remember the case because it's a holy case. I mean, I don't mean to make light of it, but I was trying to come up with it. Well, they flee, they stay overnight, and somebody drowns in a swimming pool. I mean, maybe we're pushing the limits there. Well, I'm not supposed to give away any more than I have to, but I'm sure there's some limit on this at some point. You know, if they're driving down the road and a meteorite comes down next to the car, well, I'm not arguing that case. I don't know how that would come out, but this one I don't have a problem with because they were trying to avoid apprehension that was part of the jointly undertaken activity, and it wasn't necessarily perceivable that it would happen that way, but they could have run into a cow, they could have run into a truck, they could have run off a bridge, or the police could have taken action. The police could have bumped a fender and rolled the car. I mean, all of those things are shocking, but not surprising, perhaps. But the particular manner doesn't have to be foreseeable, but the nature of the injury and death in a high-speed chase is, in this type of circumstance, a significant reason to foreseeable because that's what we're almost no doubt about. And did you say that relatives of this defendant were driving the cars? No, it wasn't relatives of this defendant. The drivers were, or the transporters, were two brothers from Hobbs, New Mexico, the Carlos and Orlando. Yeah, and it was one of their relatives who was in Hobbs. Yes, and they were all from Hobbs, and then the driver of the vehicle that got shot up was a 17-year-old. Right. I'm just, I'm stunned at the age. These were kids, 17, 18, and 19. They used minors all the time. Yes. Anything else? I'll give my time back. Okay, thank you. Thank you. Okay, Ms. Miller. Thank you very much. I'd like to speak first in regards to the death finding. In terms of Mr. Gaspar Felipe's conduct, this court has held in one of the government's cases in Garza that the act of traveling through brush, first of all, doesn't create a risk of substantial harm or death. And following on from that, if you can be, if the limit is too far to be struck by a meteorite and die from that, then it follows that there has to be some impact of the manner of death on foreseeability. Right, the manner of death or the way that the injury happens. Our position in this case is that although dying from a car accident or a possible high-speed chase, those are not facts that are in this case. We have a high-speed chase. We don't have a crash as a result of that. We don't have anything like that. We have police officers who fire their weapons against their own policy, causing the death in this case, when the vehicle was already disabled and already by the side of the road. Well, when you say it was disabled, my understanding is that they continued to drive, which is why the officers wrongly decided to shoot at it. When the vehicle was actually, so the vehicle had its tire ripped out, which is what testimony showed, and it was driving from the wrong lane of traffic back into the other lane of traffic off the left side of the road before the shooting took place. It was slowing down to 10 miles per hour or less from what the testimony showed at the time that the officers fired their weapons. It was fully off the road, not facing any oncoming vehicles, and was starting to go into a fence whenever the shooting actually began taking place. And that matters because it goes into Mr. Gaspar Felipe's contribution. And remember, he doesn't speak any English. The drivers of these vehicles were communicating. The two brothers, one brother was in the first vehicle, the second brother was in Mr. Gaspar Felipe's vehicle. They were talking to each other on the cell phone in English, not in Spanish. And Mr. Gaspar Felipe was merely a passenger in the second vehicle. He had no idea the shooting had even taken place for a long time after it actually occurred. I think that there is a real, there's a deep level of unfairness that should be considered in this case only because Mr. Gaspar Felipe never contravened his guilt in the alien smuggling. He never did. He tried many, many times to plead guilty to that. He just didn't. Even on appeal, though, he's saying he wasn't involved in transporting and he wasn't doing it for financial gain. So that has nothing to do with the death. I thought he's still challenging those elements. His lawyers are challenging those elements, yes. Yes, Your Honor. Mr. Gaspar Felipe... Well, you only, as a defendant, you act through your agents being the attorneys. Prior to trial in this case, Mr. Gaspar Felipe tried many, many times to plead guilty to everything but the death language. Why wasn't he allowed to? You're allowed to. He might not have gotten a plea agreement, but no one can stop you from pleading guilty to certain offenses and just contesting others. The government would not accept a plea. We were instructed the government would not accept a plea. Are you talking about a plea agreement? There's no right to a plea agreement. But you have the absolute right, I know we have case law on this, that you can walk into court and say, I plead to these charges and I just want to contest this one. The government, that's not for the government. That's the district judge has to let you do that. That's not what occurred in this case, Your Honor. You should have raised it if that's really what happened because I know we have a case, well, anyway. And then once the decision was made and we decided to provide delegate advocacy under the Sixth and contested cases once we were in the trial decision. But the one issue that Mr. Gaspar Felipe has ever contested had to do with the death. He was successful with that in front of the jury. Let me just pursue that for one more second because if he had walked into court on the day of trial and said, I'm guilty of alien smuggling, then we wouldn't have this whole issue of the unavailability of witnesses, would we? The only issue would have been the 10-level enhancement. And possibly an acceptance argument attached to that enhancement. Right, that's my point. And then just to speak, I don't know if I have any more time, though. Yes, ma'am. One more comment. Just to speak on the efforts that were not made by the government on the Confrontation Clause issue. Here, the letter gave the material witnesses instructions on how to get from Mexico to the United States. They live in Guatemala. They have no idea how to get to the United States and that was part of the deposition testimony. Data before. I'm not really, that's not really very convincing. Furthermore, the government also did not try to get in touch with material witnesses' attorneys. I actually was able to talk to one of the material witnesses before the trial because I did so. So they were, those efforts would have borne fruit if they had done things like contact the government of Guatemala, the consulate, try to issue checks to them before. I think I can ask you, how did you reach them? I contacted one of their attorneys who is a public defender in Alpine, Texas. And he was able to get through to his witness. And that was pre-trial. All right, thank you. Thank you, Your Honor. You and Mr. Castillo are both court-appointed and you've done an extraordinarily good job for your clients and the court very much appreciates your efforts. Thank you. Thank you. Goodbye, Mr. Goodman.